UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MAJOR THOMAS G. COLEMAN,

     Plaintiff,

      v.

FRANK KENDALL, Secretary of the Air
Force,

     Defendant.

Civil Action No. 22-1822 (JDB)

## MEMORANDUM OPINION

Major Thomas G. Coleman was separated from the Air Force in 2013. Following his separation, Coleman filed an application with the Air Force Board for Correction of Military Records ("AFBCMR" or "Board") seeking numerous corrections to his Air Force records that would allow him to continue serving in the Air Force and retire with full benefits. The AFBCMR denied his requested relief, and Coleman now challenges that denial as arbitrary and capricious under the Administrative Procedure Act ("APA"). Both parties have moved for summary judgment. For the reasons set forth below, the Court concludes that to the extent they are reviewable, the AFBCMR's decisions were not arbitrary and capricious and thus will grant summary judgment to defendant Frank Kendall, Secretary of the Air Force, on all claims.

## Background

### I.   Statutory Background

#### A.  Promotions

Air Force members are considered for promotion by a "promotion selection board" a fixed period of time after their last promotion. Mem. in Supp. of Def.'s Mot. for Summ. J. [ECF No. 11-1] ("Def. Mot.") at 3; see 10 U.S.C. §§ 611(a), 14101(a). This timeline is colloquially referred to as an officer's "promotion clock." See Mem. in Supp. of Pl.'s Combined Resp. to Def. Mot &

Pl.'s Cross Mot. for Summ. J. [ECF No. 14-1] ("Pl. Mot.") at 4.  Reserve Air Force members are generally considered for promotion to lieutenant colonel seven years after their promotion to major.  Def. Mot. at 5–6; see 10 U.S.C. § 14303 (setting minimum length between promotions but instructing that agency may extend length).

The promotion selection board, which is convened every year to consider officers who are eligible for promotion, makes its promotion decisions based on each officer's military file.  The "lead document" in an officer's file is Air Force Form 709, Promotion Recommendation ("Promotion Recommendation Form" or "PRF"), which "contains a summary of the officer's career history and records."  Def. Mot. at 4.  The officer's file also includes an Officer Performance Report ("OPR") from each year assessing the officer's annual performance.  See, e.g., AR 99–101 (Coleman's OPR from February 2001 to September 2002).  Finally, the file also contains a recommendation from a "senior rater"—often the rating official above the officer's immediate supervisor—as to the officer's promotability.  Id.  The senior rater has three options: "Definitely Promote" ("DP"), "Promote" ("P"), and "Do Not Promote This Board" ("DNP").  Id.; see also Department of the Air Force Instruction 36-2406, Officer and Enlisted Evaluation Systems, at 8.2.1.1 (defining each term).  The senior rater's assessment is not controlling—it is submitted along with other information about the officer's military service, and the promotion selection board assesses candidates before it.   The promotion selection board then makes promotion recommendations and sends its findings to the Secretary of Defense for approval.  See Def. Mot. at 5.

In addition to the promotion selection board, the Secretary may also convene a "special selection board" ("SSB") outside the normal course under certain circumstances.  See Def. Mot. at 11–12.  Relevant here, where the Secretary "determines . . . that there was material unfairness" in a candidate's initial consideration by a selection board, "the Secretary may convene a special

selection board" to determine whether the candidate "should be recommended for promotion." 10 U.S.C. § 628(b)(1).  The SSB then considers "the record of the person whose name was referred to it for consideration as that record, if corrected, would have appeared to the board that [previously] considered him," with the person's record corrected to remove the material unfairness.  Id. § 628(b)(2).

### B.  Retirement Clock

After 20 years of qualifying service, members of the Air Force Reserve may retire with eventual access to full military benefits.[1]  But not all officers are able to reach that milestone: if officers are twice considered but not selected for promotion to the next highest grade, they are removed from service—also known as "separation"—even if they have not completed the 20 years necessary for full retirement benefits.  See Pl. Mot. at 3–4; see also 10 U.S.C. §§ 14501, 14506.  However, after completion of their eighteenth qualifying year of service, members are considered to have "sanctuary status," meaning they cannot be discharged for failure to be promoted and they are permitted to complete the last two years of their 20-year requirement and obtain full retirement benefits.  Def. Mot. at 6; Pl. Mot. at 3; see 10 U.S.C. §§ 9311(b)(1), 12646(a).

The Air Force calculates time for reserve members differently than for active members, as they often have a "limited commitment as compared to regular component servicemembers."  Def. Mot. at 6.  Air Force Reserve members are required to complete certain requirements within each one-year period of their reserve service, which are called Retention/Retirement" or "R/R" years.[2]  If they complete those requirements in a given year, that year counts as a "good" or "qualifying" year towards retirement; and if they fail to complete the requirements in a given year, that year is

---

[1] This 20-year period is called the Total Active Federal Commissioned Service ("TAFCS") time.  Pl. Mot. at 3–4.

[2] An R/R year does not track a calendar year, but rather is calculated in 365-day periods that vary based on a member's start date.  Def. Mot. at 6.  The R/R year is generally calculated from the date the member joins the Air Force or the Air Force Reserve.  Id.

considered a "bad" year and does not count toward the 18 years necessary for retirement. Id.  To meet the requirements and thus have the R/R year count as a "good" year, a member must accumulate 50 points, 15 of which are automatically awarded at the end of the 365-day period. Id. at 7; Pl. Mot. at 3; see 10 U.S.C. § 12732(a)(2).  The rest of the points can be earned through "active participation in specified duty periods, such as drill weekends for certain categories of reservists."  Def. Mot. at 7 (citing 10 U.S.C. § 12732(a)(2)).

For members of the Air Force Reserve, then, the passage of each year has two significant effects: it moves the member one year closer to the time at which they will be up for promotion again (and thus at risk of separation if they are twice passed over), and is also an opportunity to add a "good" year towards their pursuit of 18 "good" R/R years.  These two clocks do not necessarily work in tandem—some members may reach 18 "good" R/R years many years before they fail to be promoted; others may receive two non-promotion decisions and be separated years before they come close to the 18-year retirement "safe harbor."  As will be described below, Coleman fell in neither in those categories: unluckily for him, his 18-year "safe harbor" for retirement fell just weeks after his final non-promotion decision, which triggered his separation date.

Finally, members of the Air Force Reserve can, under certain circumstances, be placed in "inactive" status as part of the Individual Ready Reserve ("IRR").  Def. Mot. at 7.  While in IRR, members "are generally not expected to perform duty, nor do they accumulate pay." Id. (citing 10 U.S.C. § 10141).  Time spent in IRR also does not count towards the member's retirement or promotion clocks. Id. (citing 10 U.S.C. § 12732(b)(1)).

## II.    Factual Background

Coleman joined the Air Force in 1987 and served on active duty from September 1991 until June 2001. See Pl. Mot. at 4; AR 64.  In June 2001, Coleman transferred to the Air Force

Reserve.  Pl. Mot. at 4; AR 64; Def. Mot. at 9.  He was promoted to the rank of major on September

9, 2002, beginning his (approximately) seven-year promotion clock; meaning after approximately

seven years of active time as a major, he would be up for promotion again, and if he was twice

considered for promotion and not selected, he would be separated from the Air Force.  Pl. Mot. at

4; see Def. Mot. at 9.

In June 2006, Coleman's civilian employer informed Coleman that he was being

transferred to Singapore.  Pl. Mot. at 5; Def. Mot. at 10.  This move caused a number of issues

with his Air Force Reserve responsibilities, and he was unable to fulfill his reserve duty

responsibilities in 2006—thus making it a "bad" year in terms of his R/R clock.  See Pl. Mot. at 5.

In February 2007, Coleman, concerned about the impact that his transfer to Singapore had on his

R/R clock, requested that he be transferred to inactive status while he was living abroad.  See id.

at 7.  A transfer to inactive status stops an officer's promotion clock until he finds another

assignment.  See id.  His unit, however, did not process the transfer until March 2008, with an

effective date of September 2008.  Id.; see also AR 126.  The time between his requesting date of

February 2007 and September 2008 thus counted as "bad" time in terms of Coleman's promotion

and R/R clock.  See Pl. Mot at 7.

But it did not stay that way: in 2011, Coleman brought this issue to the AFBCMR, arguing

that he should have been transferred to inactive status earlier than September 2008.  See Pl. Mot.

at 8–9.  The AFBCMR issued its decision in December 2011, agreeing with Coleman to a degree.

See AR 174–77.  The Board determined that, per an Air Force policy, the date Coleman should

have been transferred to inactive status was August 2007, six months after Coleman submitted the

request in February 2007.  Pl. Mot. at 9; Def. Mot. at 11; AR 175–76.  Notably, the AFBCMR

denied Coleman's request to have that date moved all the way back to June 2006, see AR 175, and

Coleman did not challenge that decision.  Thus, following the AFBCMR's 2011 decision,

consistent with Air Force policy that "the applicant's reassignment date should be effective six months from the date of his request for voluntary reassignment," Coleman's record was edited to reflect that "[h]e was reassigned to the Inactive Status List Reserve Section (ISLRS) effective 18 August 2007." Id. 176; see also id. 181 ("In accordance with the Secretary of Air Force Memorandum . . . dated 2 Dec 2011, your records have been corrected [to reflect that] . . . [y]ou were reassigned to the [ISLRS] effective 18 Aug 07. . . . ").

Coleman did not find a new position within the Air Force Reserve—and thus did not start earning "good" time again—until 2009. See Pl. Mot. at 6. As dictated by his promotion clock, he went before a promotion board in 2009, and again in 2010, and was not selected for promotion to Lieutenant Colonel on either occasion. See id. at 7–8; Def. Mot. at 9–10. His PRF submitted to the 2010 promotion board included a "P" promotability recommendation from his senior rater, which is lower than a "DP," or "Definitely Promote." Def. Mot. at 10. Coleman agreed that the "P" rating was appropriate as he had not yet completed the Air Command and Staff College. Def. Mot. at 10; see Pl. Mot. at 8.

Because Coleman had been twice passed over for promotion, he was forced to separate from the Air Force and was given a separation date of June 1, 2011. Pl. Mot. at 8; Def. Mot. at 10. However, in late 2011, the AFBCMR issued the decision on Coleman's first application (described above), which, among other things, changed the effective date of his inactive status, giving him more time on his promotion clock. Coleman was thus reinstated into the Air Force Reserve in February 2012 and began preparing to go before two promotion boards—the 2012 promotion board and a specially convened SSB that would evaluate his performance as of 2011, per the AFBCMR's decision. See Def. Mot. at 11–14.

The 2011 AFBCMR decision had one notable quirk: because it changed the dates of his R/R clock, it also converted a "good" year to a "bad" year because Coleman only received 48

points during the new 365-day period.  See AR 220 ("One effect of [the 2011 decision] was to move my Retirement/Retention date from 11 May to 21 Apr.  This date change created an 'unsatisfactory' participation year (21 Apr 2009–20 Apr 2010) when I had previously me[t] the participation requirements with my original 11 May 2009–10 May 2010 R/R Date.").  Coleman thus filed a second application with the AFBCMR requesting that it add the now-missing two points, which would make his April 21, 2009–April 20, 2010 year a "good" year, as it was before the AFBCMR's 2011 decision.  See id.  The AFBCMR granted this request.  Id. 255.

In addition, Coleman had been separated from the Air Force in June 2011 and was not reinstated until February 2012.  In his second application to the AFBCMR, Coleman argued that he was prevented from earning his necessary participation points in the R/R year from May 11, 2011 to May 10, 2012 because of this gap in his service during that year.  See AR 220–21.  The AFBCMR agreed that was unjust and credited him with the necessary participation points for that R/R year such that it counted as a "good" year.  Id. 255 (granting points for the now-adjusted R/R year from April 21, 2011 to April 20, 2012).

Finally, the AFBCMR ordered that the Air Force convene SSBs for 2011 and 2012 "to reevaluate [Coleman's] promotion due to the errors caused by the first AFBCMR decision."  Pl. Mot. at 11–12; AR 255. [3]

To recap Coleman's experience from 2006 to 2012: after his transfer to Singapore, Coleman had difficulty either earning the necessary participation points for "good" R/R years or entering inactive status, either of which would have paused his promotion and R/R clocks.  In

---

[3] This application to the AFBCMR included one other request, which the Board ultimately denied.  Coleman asked that, if the 2012 selection board did not recommend him for promotion—which would lead to his discharge, as it would be the second promotion board to consider him and not promote him—those results be invalidated and he be given at least 15 months between his February 2012 reinstatement and his next promotion board.  See AR 220–21; Def. Mot. at 14.  Granting that relief would have given Coleman an extra year on his promotion clock and on his R/R clock, meaning he would not have received his second promotion board decision (a denial of promotion triggering separation) until after he had reached the 18-year "safe harbor" on his R/R clock.  See Def. Mot. at 14–15.

recognition of the role the Air Force may have played in frustrating his ability to move towards promotion, the AFBCMR moved his effective date of inactive status back by a year—to the date on which Coleman should have been granted inactive status under Air Force policy.  But that was not the full relief Coleman wanted: he had asked for the inactive status date to be moved back even further, but the AFBCMR declined to do so.  For Coleman, the effect of that decision was good in one way and bad in another: good, insofar as it gave Coleman additional years before he had to face a promotion board and potentially mandatory separation; but bad, as it inadvertently scrambled his R/R participation points for two separate years.  So Coleman returned to the AFBCMR requesting that it edit his R/R participation point count for those two years, which it did.  Thus, by all accounts Coleman's issues had been addressed by the AFBCMR: it had granted him substantial—if not perfect, in his view—relief.  By the end of 2012, Coleman had 17 "good" R/R years.[4]

In 2012, although back in the Air Force Reserve, Coleman still faced his (now-corrected) promotion and R/R clocks.  As Coleman prepared to go before the 2012 promotion board, he requested a discussion with Colonel Morin, the senior rater responsible for the "P" evaluation in his PRF.  Def. Mot. at 13; see AR 205–08.  He asked "to discuss the 'P' rating and receive any other feedback [Col Morin] ha[d] on [his] performance and future."  Def. Mot. at 13; AR 205–08.  Coleman and Col Morin spoke in June 2012, and Coleman sent Col Morin an email recapping their discussion on June 27, 2012, which did not mention any objections to the PRF.  AR 205.

On August 10, 2012, the Air Force notified Coleman that he had not been selected for promotion for the second time and thus his promotion clock was up and he would accordingly be separated from the Air Force Reserve effective March 1, 2013.  Def. Mot. at 13; AR 241.  Because

---

[4] AR 274 reflects Coleman's service history as of March 1, 2013.  He has "good" years in the years starting May 1991, May 1992–May 2004, and the years starting April 2009, 2010, and 2011.

Coleman's R/R years ran from April to April, to obtain his eighteenth "good" year, Coleman could not be discharged prior to April 20, 2013 (assuming, of course, he met the requirements for a "good" year during that time period).  However, Coleman was honorably discharged on March 1, 2013, seven weeks shy of completing the 18 years of service required for safe-harbor status and thus without full retirement benefits.

As discussed above, in response to Coleman's second application to the AFBCMR, the Board had ordered that Coleman be considered by an SSB for 2011 and 2012.  See AR 255.  Due to the timing of the decisions, those SSBs would not convene until after Coleman had been separated from the Air Force.  In advance of his appearance before those SSBs, Coleman reached out again to Col Morin to request that he change his recommendation from a "Promote" to a "Definitely Promote."  AR 267–68; Def. Mot. at 15.  Coleman sent Col Morin extensive documentation of his interactions with the AFBCMR and his military record.  See AR 267–309.  However, after "thorough consideration" of Coleman's submissions, Col Morin declined to change his recommendation to a "Definitely Promote."  AR 314.

Coleman had also been in conversations with his supervisors about the Meritorious Service Medal ("MSM"), which is awarded to service members who demonstrate "outstanding meritorious achievement or service."  See Def. Mot. at 33 (quoting Air Force Regulation 36-2806); Pl. Mot. at 19.  It was first discussed in 2011 but was "put on pause to await the results of [Coleman's] first AFBCMR application."  Pl. Mot. at 19.  The record also reflects that Coleman's supervisor, Lt Col Barry Behnken, discussed awarding the medal to Coleman in November 2012.  AR 245–49.  However, Coleman was never awarded the MSM.  Pl. Mot. at 20.

Coleman thus went before the 2011 and 2012 SSBs with a corrected record but a "Promote" recommendation on his PRF and no MSM.  He was not selected for promotion by either board.  Def. Mot. at 16.

### III.   Procedural Background

On June 30, 2015, Coleman submitted the application at issue here—his third application—to the AFBCMR.  AR 20–50; <u>see</u> Def. Mot. at 16; Pl. Mot. at 13–14.  The application detailed his experience from 2006 to 2013 and requested the following relief:

(1) "[T]hat the AFBCMR direct a [2012 special selection board]";

(2) "[T]hat Col[.] Morin's erroneous PRF be corrected to reflect a "Definitely Promote" promotion recommendation";

(3) "[T]he receipt of the Meritorious Service Medal award";

(4) That "the AFBCMR . . . take steps to ensure that [his] 2012 OPR . . . is as fair as possible"; and

(5) That "he be credited with an additional seven weeks of service in the 2012–2013 R/R year that would qualify him for sanctuary protections and allow him to secure a reserve retirement."  AR 42.

The AFBCMR sought an advisory opinion from the Director of the Air Force Reserve Selection Board Secretariat.  Def. Mot. at 16–17.  The Director of the Secretariat analyzed Coleman's arguments and issued an opinion in March 2016 that each of his requests should be denied.  <u>See</u> AR 327–32.  In May 2016, the AFBCMR met to consider Coleman's application and, in line with the Secretariat's advisory opinion, voted unanimously to deny relief.  <u>See</u> AR 18.

Coleman appealed that denial in December 2018.  Def. Mot. at 17–18.  His reconsideration request included a number of proposed record adjustments, any one of which would have changed Coleman's records to reflect 18 years of service and thus qualify him for sanctuary status.  <u>See</u> AR 5; Def. Mot. at 18–19.  The AFBCMR again requested an advisory opinion, this time from the Sustainment Division at the Air Reserve Personnel Division, which recommended that the AFBCMR deny the relief sought.  AR 1108–09; Def. Br. at 19.  In accordance with that advisory

opinion, the AFBCMR voted unanimously to deny Coleman's application for reconsideration in December 2019.  AR 7; Def. Mot. at 19.

Coleman filed the present lawsuit on June 24, 2022, challenging the AFBCMR's decisions denying his record correction requests.  See Compl. to Set Aside Agency Action as Arbitrary, Capricious, & Unsupported by Substantial Evid. & for Direct Relief by the Court [ECF No. 1] ("Compl.").  Following a request from the parties, the Court vacated the Secretary's deadline to answer and set a summary judgment briefing schedule.  See Sept. 23, 2022 Order [ECF No. 4]. The Secretary filed a motion for summary judgment on December 20, 2022, see Def. Mot.; Coleman filed his response and cross-motion for summary judgment on February 10, 2023, see Pl. Mot.; the Secretary filed a combined response to Coleman's cross-motion and reply in support of his motion on April 4, 2023, see Combined Reply in Supp. of Def. Mot. & Mem. in Opp'n to Pl. Mot. [ECF No. 16] ("Def. Resp."); and Coleman filed a reply in support of his motion on May 1, 2023, see Pl.'s Reply in Resp. to Def. Resp. & in Supp. of Pl. Mot. [ECF No. 18] ("Pl. Resp."). Finally, the parties filed the joint appendix on May 15, 2023.  See J.A. [ECF No. 19].  Both motions for summary judgment are thus ripe for decision.

## Legal Standards

In reviewing agency decisions, "the district judge sits as an appellate tribunal," and the "'entire case' on review is a question of law."  Am. Bioscience, Inc. v. Thompson, 269 F.3d 1077, 1083 (D.C. Cir. 2001).  "Summary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review."  Styrene Info. & Rsch. Ctr., Inc. v. Sebelius, 944 F. Supp. 2d 71, 77 (D.D.C. 2013) (internal quotation marks omitted).

A reviewing court may set aside a final agency decision if the decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

"The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).  A court should "not disturb the decision of an agency that has examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." MD Pharm., Inc. v. Drug Enf't Admin., 133 F.3d 8, 16 (D.C. Cir. 1998) (cleaned up).  There is no requirement that an agency's decision "be a model of analytic precision to survive a challenge," Dickson v. Sec'y of Def., 68 F.3d 1396, 1404 (D.C. Cir. 1995); instead, "[a] reviewing court will 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned,'" id. (quoting Bowman Transp., Inc. v. Arkansas-Best Motor Freight Sys., 419 U.S. 281, 286 (1974)).

In addition, "Congress has granted the secretaries of military departments wide latitude with respect to the correction of their department's records," which "substantially restrict[s] the authority of the reviewing court to upset the Secretary's determination." Powers v. Donley, 844 F. Supp. 2d 65, 70 (D.D.C. 2012) (alteration in original) (quoting Kreis v. Sec'y of Air Force, 866 F.2d 1508, 1514 (D.C. Cir. 1989)).  Thus, decisions on correction of military records are afforded "heightened deference." Cargill v. Marsh, 902 F.2d 1006, 1008 (D.C. Cir. 1990); see also Viles v. Ball, 872 F.2d 491, 495 (D.C. Cir. 1989) ("The standard for review of Board judgments is exceptionally deferential . . . .").

## Analysis

### I.    The AFBCMR's Decision to Deny Coleman 49 Days of Credit That He Did Not Serve Was Neither Arbitrary Nor Capricious.

Coleman asked the AFBCMR to credit him with 49 days of service time.  If it had done so, his final year of service would be a "good" R/R year, Coleman would reach the 18-year "safe harbor," and he would be allowed to serve all 20 years before retiring with full benefits. See AR 42 (requesting that "he be credited with an additional seven weeks of service in the 2012–2013

R/R year"). He argues that his failure to reach the 18 years required for the retirement "safe harbor" was due to the Air Force's various errors. See Pl. Mot. at 16–18. The AFBCMR declined to credit Coleman with those 49 unserved days, and Coleman now argues that that decision was arbitrary and capricious. Having reviewed the record and both sides' arguments, the Court will not disturb the AFBCMR's decision.

On the surface, the Board's decision and reasoning is simple: Coleman "did not remain in active status long enough to qualify for 18 years of satisfactory service," and thus granting him the requested relief "would be contrary to the criteria established in 10 U.S.C. § 12646 which establishes criteria for satisfactory service." AR 15 (AFBCMR recommendation on Coleman's third application). Hence, because Coleman did not serve those 49 days, he should not be credited with them. See AR 330 (advisory opinion noting that "[f]rom a participation points and service history perspective, the applicant did not remain in active status long enough to qualify for 18 years of satisfactory service"); Pl. Mot. at 18 (characterizing the AFBCMR's concern that Coleman would be credited "points for work not completed").

In his brief, Coleman shies away from that reality—that he is requesting credit for time he did not serve—by attempting to reframe what he requested from the AFBCMR. Instead of focusing on his request for seven weeks' Air Force service credit, see AR 42, Coleman argues that "[h]ad the AFBCMR correctly restored the 34 months of Plaintiff's lost TAFSC [the retirement clock], he would have . . . faced his mandatory retirement date by Fall of 2013 at the earliest, likely half a year later." Pl. Mot. at 16; see also id. at 17 ("[T]he loss of 34 months of TAFCS meant the loss of three R/R years of opportunity . . . . Making Plaintiff whole required the granting of this additional time . . ."). But the Court is limited to reviewing the request he made to the agency, which was specifically for 49 days' credit added to his time in the Air Force, not a 34-month adjustment to his R/R clock.

Further, Coleman's briefing provides the Court little reason to credit him with those 49 days: his briefing is conclusory, repeatedly asserting that not crediting him for 49 days would be a "manifest injustice" and referencing the Air Force's alleged errors from earlier in his career without explaining how any of those events merits the relief he seeks.  See Pl. Mot. at 16–18. Nonetheless, given the extensive history of his time in the Air Force, the Court will attempt to parse the facts to determine whether there was, in fact, an injustice that the AFBCMR clearly failed to correct.

Coleman argues that the "lengthy complications forcing his mandatory retirement are all the result of" the Air Force's delays associated with his move to Singapore, "which cost the Plaintiff the opportunity to earn retirement credit." Pl. Mot. at 16.  Specifically, it appears that the injustice Coleman identifies—which he argues merits adding 49 days' credit—is the fact that his record reflects two "bad" years for the R/R years from 2006 to 2008.  See, e.g., AR 6 (noting that Coleman's most recent reconsideration application requested a correction to his record "to reflect at least two 'good' R/R years from 2006 through 2008").  As a reminder, Coleman was relocated to Singapore in June 2006 and received two "bad" years towards his retirement clock until he was transferred to inactive status in September 2008, which then paused his R/R and promotion clocks. In his first AFBCMR application, Coleman requested that his records be changed to reflect a transfer to inactive status in June 2006, which would have paused his promotion clocks immediately and resulted in no "bad" years of credit during that time frame.[5]  The AFBCMR declined to order that requested relief in full, instead only moving his inactive status date back to August 2007, citing an Air Force policy that made Coleman's inactive status effective six months

_____

[5] However, that requested change would not have added "good" years because time spent in inactive status does not count in any way towards an Air Force member's promotion clock.  Accordingly, even moving the date on which Coleman entered inactive status further back would have only indirectly impacted his promotion clock.

after he requested it (Coleman requested the change to inactive status in February 2007).  See AR 181.

The record thus suggests that Coleman's true qualm is with the AFBCMR's decision on his first application, in which it—according to Coleman—provided "only a partial fix for the real problem, which is that Plaintiff should have seamlessly transferred . . . and earned credit towards retirement, had [his supervisors] not delayed processing the basic paperwork."  Pl. Mot. at 9.

To the extent that the 2006 to 2008 period is the basis for the injustice Coleman believes he faced, the AFBCMR's decision on his third application in 2015 not to credit him with 49 days of time he did not serve was not arbitrary or capricious.  As the Board on reconsideration noted, Coleman's service history from that time period "reveals [he] did not actively participate in his unit" and that "he was unable to participate due to not receiving a transfer."  AR 2.  Of course, Coleman would argue that his lack of participation was caused by the Air Force.  But that issue was addressed in 2011, when the AFBCMR determined the proper relief for any errors by the Air Force in 2006 to 2008 (namely, moving his inactive status date back to August 2007)—a decision Coleman did not challenge at the time.

To the extent that Coleman was unhappy with the AFBCMR's corrective action in 2011 and believes that incorrect decision merits adding 49 days' credit now, he had an opportunity to challenge the Board's 2011 decision in the following years.  And, in fact, he did successfully challenge that decision's impact on his promotion clock: Coleman identified two R/R years that were inadvertently impacted by the AFBCMR's 2011 decision, and successfully petitioned for relief in his second AFBCMR application.  He was ultimately credited two additional "good" years in the AFBCMR's decision on that application.  See AR 255.

In sum, the AFBCMR took numerous corrective actions to account for the Air Force's role in frustrating Coleman's promotion and R/R clocks over the years, including moving back the date

of his inactive status and awarding him enough retirement participation points to switch two of his "bad" R/R years to "good" years.  If there was some unaddressed issue related to his R/R year calculations, Coleman was surely aware of it at the time of his first and second applications to the Board, but he failed to raise it then.  When Coleman faced mandatory separation in 2013—two years after his initial mandatory separation date—it was not because the Air Force declined to act on some request from him, but because even after it acted, giving him multiple additional chances at a promotion board, he twice failed to be promoted.  See Pl. Mot. at 5 ("[A]t the end of this period, Plaintiff would face mandatory retirement had he not reached the rank of Lieutenant Colonel.").  Understandably frustrated at that outcome, Coleman asked the AFBCMR, and now asks the Court, to fashion any relief to get him to sanctuary status.[6]  But he has not identified any unremedied injustice that would warrant crediting him 49 days of unserved time.[7]  Particularly in light of the "exceptionally deferential" standard the Court affords decisions on military record corrections, Viles, 872 F.2d at 495, the Court concludes that the AFBCMR's decision to deny him that credit was not arbitrary and capricious.

---

[6] As described throughout this Opinion, Coleman has varied the specific changes to his records that he is requesting—all of which are designed to get him to the 18-year sanctuary status.  In his initial application, he requested 49 days' credit, see AR 42; in his application for reconsideration, he requested that his inactive status date be moved back to May 2006 from August 2007 and that he be credited two "good" years for 2014 and 2015, see AR 1; in his complaint in this case, he reiterates his request for 49 days of service credit, see Compl. ¶¶ 241–92; and in briefing, he asks for the Court to restore 34 months to his retirement clock, see Pl. Mot. at 16.

[7] Coleman notes that the relief that the AFBCMR gave him helped his chances at promotion, but did not, he argues, help his progress towards the required retirement years.  Pl. Mot. at 17.  He argues that this was "half-a-loaf" of relief and that the AFBCMR's failure to recognize the Air Force's errors in his retirement timeline while recognizing such errors "in the context of the Promotion Boards and their associated timelines" was arbitrary and capricious.  Id. (quoting DeBow v. United States, 434 F.2d 1333 (1970)).  However, the relief requested is categorically different.  Pushing back Coleman's promotion clock was a simple tolling of a clock; he was still required to attempt promotion on the merits.  Crediting Coleman with work he did not do—which would be required in order for Coleman to reach the 18-year sanctuary status—is much more significant relief, which the Air Force was clearly unwilling to grant him.

II.     **The AFBCMR's Decision Not to Change Col Morin's "P" Rating Was Neither Arbitrary Nor Capricious.**

Coleman's second challenge argues that the AFBCMR's decision not to change his PRF rating to a "Definitely Promote" in advance of his 2012 SSB—the final promotion board he went before—was arbitrary and capricious.  See Pl. Mot. at 18–19.

In preparing for his 2012 SSB, Coleman sent a letter to Col Morin requesting that he consider changing the rating Col Morin had given Coleman on his PRF from "P"—promote—to "DP"—definitely promote.  See AR 267–68.  In that letter, Coleman stated his belief that two factors influenced Col Morin's decision to award him a "P" in CY2012: (1) Coleman's "lack of participation over the last year" and (2) "the fact that [he] was 'passed over' in the CY2011 O-5 promotion board."  AR 267.  As for the first issue, Coleman informed Col Morin that the AFBCMR had adjusted his military records to reflect that two participation years which had previously been marked "bad" years were now marked as "good" participation years.  Id.  And Coleman told Col Morin that his CY2011 board results "were invalidated" and that, in any event, "each Reserve PRF [should] be considered as a standalone event and should not be influenced by past board results." Id.  In response, Col Morin wrote, "I have reviewed the package you sent me with the corrections to your record.  After thorough consideration of this update and your overall record, I have decided to maintain the original promotion recommendation on your [CY2012 promotion board] PRF." AR 314.

Coleman's third application to the AFBCMR challenged this decision.  See AR 42–47. The advisory opinion recommending that the AFBCMR decline to change Coleman's PRF rating addressed Coleman's arguments, some of which are repeated in his complaint.  It concluded its discussion by noting that "[t]he Air Force has no set method to determine which records will be given a 'DP' recommendation and which will receive a 'P,' so there is no set standard to determine what an 'inaccurate assessment' would be."  AR 329.  Because the "Air Force has given [the senior

rater; here, Col Morin] the sole responsibility for evaluating [Coleman's] record, determining promotion potential and determining a promotion recommendation," and there was no indication that he "considered any prohibited information when determining his recommendation," and particularly in light of the fact that there were numerous factors that weighed against finding that Coleman was in the top tier of his promotion class, the advisory opinion recommended that the AFBCMR decline to change Coleman's PRF rating. AR 329–31. The AFBCMR agreed, finding that Col Morin was "solely responsible for evaluating the officer's record" and that he had "thoroughly considered the information provided by the applicant and decided to maintain the original 'P' recommendation." AR 13–14.

The Court agrees with this assessment. To begin, the Court is not convinced that it has the ability to review Col Morin's decision to assign Coleman a "P" or the AFBCMR's affirmation of that rating. On the one hand, this claim appears to ask the Court "merely to evaluate, in light of familiar principles of administrative law, the reasonableness of the Secretary's decision not to take certain corrective action with respect to appellant's record"—something it is permitted to do. Kreis, 866 F.2d at 1511. But the substance of what it is reviewing is, in essence, whether Coleman was worthy of a "promote" recommendation or a "definitely promote" recommendation— something that the Court has no authority to assess. See Reilly v. Sec'y of Navy, 12 F. Supp. 3d 125, 140 (D.D.C. 2014) (distinguishing between "relief that implicates the merits of the decision whether or not [a plaintiff] should have been promoted," which is "nonjusticiable," and allegations that "denial of promotion resulted from a procedural error or statutory violation," over which "courts have been willing to exercise jurisdiction").

To the extent Coleman argues that he is deserving of a "DP" rating, the Court is unable to review Col Morin's rating and the AFBCMR's affirmation. When "courts have no legal norms pursuant to which to evaluate the challenged action, and thus no concrete limitations to impose on

18

the agency's exercise of discretion," agency action is "unreviewable."  Reilly, 12 F. Supp. 3d at
141 (quoting Sec'y of Labor v. Twentymile Coal Co., 456 F.3d 151, 156 (D.C. Cir. 2006)).  As
the advisory opinion noted, there is "no set method to determine which records will be given a
'DP' promotion"—the senior reviewer has the "sole responsibility" of making that decision.
AR 329; see also Department of the Air Force Instruction 36-2406, Officer and Enlisted Evaluation
Systems, at 8.2.1 ("A 'Definitely Promote' ('DP') recommendation means the strength of the
ratee's performance and performance-based potential warrants promotion.").  In Fluellen v. United
States, 225 F.3d 1298 (Fed. Cir. 2000), the Federal Circuit was asked to review whether a senior
reviewer "who gave [the plaintiff] a 'promote' recommendation rather than a 'definitely promote'
recommendation on his . . . PRF[] improperly considered a 1986 OER that was later voided by the
AFBCMR" and the AFBCMR's assessment of that recommendation.  Id. at 1304.  The court
concluded that "such decisions are not appropriate for review by a court" "because there are no
statutory or regulatory standards against which a court can review such a decision; it relates to a
matter left to the discretion of the military."  Id.  So too here: without any standards by which to
substantively judge whether the decisions to give Coleman a "promote" versus "definitely
promote" were appropriate, the Court cannot review the substantive decision.

At most, the Court could consider whether there was a "procedural error or statutory
violation" in the AFBCMR's decision not to change Coleman's rating.  See Reilly, 12 F. Supp. 3d
at 140.  Coleman identifies two potential procedural errors.  However, the Court is not convinced
that there was any error, let alone an error that rises to the level of being arbitrary and capricious.

First, in his application to the AFBCMR, Coleman initially argued that the CY2011
promotion board's decision not to promote Coleman should not have been considered by Col
Morin because "promotion boards do not know and are not allowed to consider the officer's
previous promotion history."  See AR 328.  But Col Morin of course knew about Coleman's

promotion history, having considered it the first time around and having been reminded of it in Coleman's 2013 letter asking him to change his PRF rating.   Coleman's argument that this "allow[s] a Promotion Board to launder impermissible evidence through the consideration of recommendations from officers who had heavily weighted information that the Promotion Board was explicitly banned from considering," Pl. Mot. at 18–19, assumes, without providing any support, that Col Morin in fact relied on the now-vacated 2011 non-promotion decision and, if so, that such reliance was impermissible.[8]   Coleman himself reminded Col Morin of his 2011 non-promotion and told him that "due to the records correction," those results "were invalidated" and that Col Morin "should not be influenced by past board results."  AR 267.  Nothing in the record suggests that Col Morin's decision or the AFBCMR's affirmance of his "P" rating rested on an impermissible consideration of Coleman's 2011 non-promotion results.

Coleman's second procedural argument—that his "P" rating was improperly "founded primarily" on his lack of participation, Pl. Mot. at 19—is similarly unsupported.  In his letter to Col Morin, Coleman explained that his two "bad" participation years were now reflected as "good" participation years.  AR 267.  Per his response, Col Morin took that into consideration and still believed that a "P" rating was appropriate.  The advisory opinion acknowledged this, finding that "[t]here does not seem to be any misunderstanding on the SR's part about the applicant's participation."  AR 328–29; accord AR 14 (AFBCMR decision noting that Col Morin "thoroughly considered the information provided by the applicant").  The Court can discern no error in this assessment either.[9]

---

[8] In his motion for summary judgment, Coleman asserts that "[g]uidance from the Air Force Reserve Personnel Center proscribes that PRFs are to be purely standalone."  Pl. Mot. at 18.  He provides no support for that assertion, and in any event, does not explain whether such "[g]uidance" is binding on reviewers such as Col Morin.

[9] Coleman makes a few other arguments in his complaint but does not rely on them in his summary judgment briefing.  None are persuasive.  For example, he argued to the AFBCMR that Col Morin was improperly biased by comments from another supervisor, Col Fisher, suggesting, for example, that Coleman should have completed formal training earlier in his career than he did.  AR 329.  But all that this proves is that Col Morin had a complete picture of

Because the Court agrees with the AFBCMR's decision and finds no error in its analysis of Coleman's "P" rating, it will grant summary judgment to the Secretary on Coleman's second claim.

### III.    The AFBCMR's Decision Not to Award Coleman the Meritorious Service Medal Was Neither Arbitrary Nor Capricious.

Coleman's third claim asks the Court to "vacate the Board's finding that Plaintiff was not due a Meritorious Service Medal and either find that substantial evidence requires a finding that Plaintiff was due the medal or grant the medal directly." [10]   Compl. at 36; see also Pl. Mot. at 19–20.

Coleman primarily argues that "the only reason [the Meritorious Service Medal] wasn't awarded was because of the administrative flux Plaintiff was finding himself in due to the AFBCMR's decisions."[11]   Compl. ¶ 327; accord Pl. Mot. at 20.   This claim thus asks the Court to consider the reasons why a discretionary medal was not awarded—something it cannot do.   To begin, Coleman offers no standard by which the Court should determine whether he is worthy of the Meritorious Service Medal.   Defendant points to the Department of Air Force Manual, which states simply that the MSM is awarded to a member who has "distinguished himself or herself by outstanding meritorious achievement or service."   Dep't of Air Force Manual 36-2806, Military

_____

Coleman's career: as Col Fisher pointed out, Coleman could have completed the formal training between 2002 and 2006, see Compl. ¶ 216, even though his service from 2006 to 2009 was in flux, id. ¶ 217.   Coleman gives no reason to believe that Col Morin or the AFBCMR made their decisions based on inaccurate facts; he argues, in essence, that if they had weighed facts differently, they would have given him a higher rating.   See, e.g., Compl. ¶ 225 ("The AO also highlighted that Plaintiffs had not been decorated since 1999"—which Coleman does not dispute—"despite the clearly glowing assessments in his OPRs.").   But a decision-maker's choice to weigh some relevant facts more heavily than others does not necessarily make their decision arbitrary or capricious, particularly in the realm of military decision-making.

[10] The "substantial evidence" standard is inapplicable where, as here, the adjudication was informal.   See McKinney v. Wormuth, 5 F.4th 42, 46 & n.1 (D.C. Cir. 2021) (citing 5 U.S.C. § 706(2)(E) and holding that the "substantial evidence" standard does not apply to an analogous decision from the Army Board of Corrections of Military Records).

[11] It is worth noting that Coleman provides no support for this conclusory statement, and the Court has no reason to believe it is accurate.

Awards: Criteria and Procedures, at A2.11.  The more detailed explanation provides little help:
"Normally the acts of services rendered are comparable to that required for the [Legion of Merit,
another honor], but in a duty of lesser though considerable responsibility."  Id. at A2.11.1.1.  These
regulations—and Coleman's inability to provide a more definite way to assess MSM entitlement—
demonstrate that awarding the MSM is a discretionary decision for which there are "no judicially
enforceable standards," which "reflects essentially professional military judgment," and that is
thus "non-justiciable."  Avery v. United States, No. 19-1774C, 2020 WL 3960341, at *4 (Fed. Cl.
July 13, 2020) (internal quotation marks omitted); see also Wilson v. United States, 24 Cl. Ct. 842,
846 (1992) ("[T]he court finds that the decision by the Air Force to award plaintiff the AFCM
instead of the MSM was purely a discretionary one and therefore is not reviewable by this court.").

As with Coleman's second claim related to his PRF rating, at most the Court could consider
whether there was some "procedural error or statutory violation" in the AFBCMR's decision-
making.  See Reilly, 12 F. Supp. 3d at 140; see also Adkins v. United States, 68 F.3d 1317, 1323
(Fed. Cir. 1995) ("[A]lthough the merits of a decision committed wholly to the discretion of the
military are not subject to judicial review, a challenge to the particular procedure followed in
rendering a military decision may present a justiciable controversy.").  The AFBCMR, through its
adoption of the advisory opinion rejecting his claim, took into account all of the facts Coleman
marshals here:

> The applicant's case states his unit was in the process of completing an MSM in
> late 2012, and provides email traffic to support this fact.  The applicant's case
> provides intent by his unit, it does not include anything from the award approving
> authority stating an MSM would have been approved if submitted.  It does not
> explain why the unit did not complete an MSM when it had the ability to do so at
> any time.

AR 330.

The AFBCMR thus considered the proper evidence, and there is no suggestion by Coleman
that its procedure was deficient.  The Court thus concludes that there was no procedural error in

the AFBCMR's consideration of the MSM issue and will grant the Secretary summary judgment on Coleman's third claim.

### IV.   Coleman Cannot Challenge the AFBCMR's Failure to Change the OPR as He Did Not Request the Change From the AFBCMR.

Coleman's fourth claim is that the AFBCMR acted in an arbitrary and capricious manner by failing to correct his 2012 OPR to "show that it reflected less than three months of service." Compl. at 37; see also Pl. Mot. at 20–21.   Defendant argues that Coleman cannot challenge this decision because "the particular request was never made to the Board."   Def. Mot. at 34–37. "Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice."   United States v. L.A. Tucker Truck Lines, Inc., 344 U.S. 33, 37 (1952).

Coleman notes in his reply that he wrote in his application to the AFBCMR: "the AFBCMR should take steps to ensure that Maj Coleman's 2012 OPR—the most recent OPR that would be considered by a CY2012 SSB—is as fair as possible, given that it only reflects two months of service due to the timing issues that resulted from the AFBCMR's first decision."   Coleman Reply at 9 (quoting AR 42).   Notably, the brief in front of the AFBCMR included that sentence, but it did not include any argument related to his OPR or any specific requested relief.   And this sentence alone is too vague to justify the relief Coleman seeks here: some sort of a notation that would inform the reader that his OPR "reflected less than three months of service."

At most, Coleman requested that the AFBCMR make his 2012 OPR "fair"—an ill-defined request which, even if the AFBCMR were inclined to take steps to make his OPR more "fair," would not necessarily result in the relief he seeks here.   This confusion over what, exactly, Coleman was requesting is reflected in the Advisory Opinion adopted by the AFBCMR, which

states that "[i]t is unclear . . . what issues the applicant has with this OPR as the case does not acknowledge this existing OPR or outline any concerns with it."  AR 330.  The Court agrees—it was Coleman's responsibility, "in the first instance, to lay out his arguments in a reasonably clear fashion, so that the [AFBCMR could] have a 'fair opportunity' to consider them."  <u>Tindal v. McHugh</u>, 945 F. Supp. 2d 111, 130 (D.D.C. 2013).  Simply stating that he wanted his report to be "fair," without any more explanation or argument, is insufficient to "place the agency 'on notice'" of his specific request to add a notation to the report.  <u>National Ass'n of Clean Air Agencies v. EPA</u>, 489 F.3d 1221, 1231 (D.C. Cir. 2007) (quoting <u>Mossville Env't Action Now v. EPA</u>, 370 F.3d 1232, 1240 (D.C.Cir.2004).

Because Coleman failed to raise this argument to the AFBCMR with reasonable specificity, he has forfeited it, and the Court will grant the Secretary summary judgment on this claim.

**V.    Coleman is Not Entitled to an SSB for CY2012.**

Coleman argues that, if the "Court determines the relief requested is warranted, [he] should be entitled to an SSB for CY 2012."  Pl. Mot. at 21.  The AFBCMR denied this relief as it could not discern any error in any of the other proceedings and ordered no changes to Coleman's records.  Because the Court similarly orders no changes and can discern no error, an SSB is not warranted and the Court will grant summary judgment to the Secretary on this final claim.

*          *          *

Coleman has not shown that any of the AFBCMR's decisions on his application for correction of military records were arbitrary and capricious.  The Court will thus grant summary judgment to the Secretary on all claims.  A separate Order consistent with this Opinion will issue.

                                                    /s/
                                        _____
                                               JOHN D. BATES
                                          United States District Judge

Dated: <u>July 26, 2023</u>